http://www.va.gov/vetapp16/Files6/1644938.txt

Citation Nr: 1644938 
Decision Date: 11/30/16 Archive Date: 12/09/16

DOCKET NO. 11-04 944 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office (RO)
in St. Petersburg, Florida

THE ISSUES

1. Entitlement to an initial disability rating in excess of 30 percent for posttraumatic stress disorder (PTSD) before May 13, 2014, and to a rating in excess of 70 percent thereafter.

2. Entitlement to an effective date prior to June 11, 2014, for the award of a non-service-connected pension.

3. Entitlement to an effective date prior to June 11, 2014, for the award of special monthly pension (SMP) based on the need for aid and attendance. 

REPRESENTATION

Veteran represented by: Disabled American Veterans

WITNESS AT HEARINGS ON APPEAL

The Veteran

ATTORNEY FOR THE BOARD

J.A. Flynn, Counsel

INTRODUCTION

The Veteran served on active duty from January 1967 to January 1969.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from a December 2009 rating decision of the VA RO. By that rating action, the RO implemented a December 2009 Board decision granting service connection for PTSD and assigned an initial 30 percent disability rating. A July 2014 rating decision increased the rating for PTSD to 70 percent effective May 13, 2014.

In January and August 2011, the Veteran testified at hearings conducted before a Decision Review Officer and the undersigned. Copies of the hearing transcripts have been associated with the Veteran's electronic record. 

This appeal was previously before the Board in March 2014. At that time, the Board remanded the initial rating claim for PTSD in order to obtain additional VA treatment records and Social Security Administration (SSA) treatment records, and to afford the Veteran with a VA examination. As is discussed in greater detail below, the Board finds that its remand instructions have been substantially complied with, and the Board will proceed in adjudicating the initial rating claim. See Stegall v. West, 11 Vet. App. 268, 271 (1998) (noting that when the remand orders of the Board are not complied with, the Board errs as a matter of law when it fails to ensure compliance); see also D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999).

The issues of entitlement to an effective date before June 11, 2014, for the award of a non-service-connected pension and an effective date before June 11, 2014, for the award of SMP based on the need for aid and attendance are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).

FINDING OF FACT

Throughout the period on appeal, the Veteran's PTSD has been manifested by symptoms producing no more than occupational and social impairment with deficiencies in most areas.

CONCLUSIONS OF LAW

1. Before May 13, 2014, the criteria for an initial rating of 70 percent, but no greater, for PTSD have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. § 4.130, Diagnostic Code 9411 (2015).

2. From May 13, 2014, the criteria for an initial rating in excess of 70 percent for PTSD have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A (West 2014); 38 C.F.R. § 4.130, Diagnostic Code 9411 (2015).

REASONS AND BASES FOR FINDING AND CONCLUSIONS

I. Duties to Notify and Assist

VA has certain notice and assistance obligations to claimants. See 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2015). The Veteran has been provided with all appropriate notice, and neither the Veteran nor his representative has either alleged or demonstrated any prejudice with regard to the content or timing of VA's notices or other development. Shinseki v. Sanders, 129 U.S. 1696 (2009). Adjudication of the Veteran's initial rating claim at this time is warranted. 

With respect to the duty to assist, VA has done everything reasonably possible to assist the Veteran with respect to this claim for benefits. 38 U.S.C.A. § 5103A (West 2014); 38 C.F.R. § 3.159(c) (2015). The Veteran's VA treatment records have been obtained, to the extent available. 

The Veteran has stated that he received disability benefits from the SSA, and the Board, in March 2014, remanded the Veteran's claim in order to obtain such records. In May 2014, the SSA informed VA that the records associated with the Veteran's disability claim had been destroyed. Later in May 2014, VA informed the Veteran of the unavailability of such records. The Board finds that VA has undertaken all appropriate efforts to obtain the Veteran's SSA records, and further efforts to obtain such records would be futile. Furthermore, given the Veteran's claim for SSA disability benefits preceded his claim in this case, and given the claim did not concern the Veteran's psychiatric disability, it is unlikely that such records would contain evidence pertinent to the Veteran's initial rating claim for PTSD. 

The Veteran was provided with VA examinations addressing the severity of his psychiatric symptoms in July 2009 and May 2014. The examination reports indicate that the examiners reviewed the Veteran's record and were familiar with his past medical history, recorded his current complaints, conducted appropriate evaluations, and provided the information necessary to render a well informed decision on the Veteran's PTSD. The Board, therefore, concludes that the existing examination reports of record are adequate for the purpose of rendering a decision in the instant appeal. 38 C.F.R. § 4.2 (2015); see also Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). 

The Veteran participated in a hearing before the undersigned in August 2011, and a transcript of this hearing has been associated with the record. Thus, the duties to notify and assist have been met, and the Board will proceed to a decision.
II. Merits Analysis

The Veteran seeks an initial rating in excess of 30 percent for his PTSD for the period prior to May 13, 2014, and in excess of 70 percent therefrom. The Board will initially discuss the laws and regulations pertaining to initial/increased rating claims and those specific to rating psychiatric disabilities prior to proceeding with its analysis of the merits of the claim. 

Disability evaluations are determined by the application of a schedule of ratings, which is based on average impairment of earning capacity. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. Part 4 (2015). Separate diagnostic codes identify the various disabilities. 38 C.F.R. Part 4 (2015). When there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2015). Any reasonable doubt regarding the degree of disability is resolved in favor of the veteran. 38 C.F.R. § 4.3 (2015).

In general, when an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). When the appeal arises from an initial assigned rating, consideration must be given to whether staged ratings should be assigned to reflect entitlement to a higher rating at any point during the pendency of the claim. See Fenderson v. West, 12 Vet. App. 119 (1999). However, staged ratings are appropriate for an increased rating claim, if the factual findings show distinct time periods where the service-connected disability exhibited symptoms that would warrant different ratings. See Hart v. Mansfield, 21 Vet. App. 505 (2007). 

The assignment of a particular diagnostic code is "completely dependent on the facts of a particular case." Butts v. Brown, 5 Vet. App. 532, 538 (1993). One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, diagnosis, and demonstrated symptomatology. Any change in diagnostic code by a VA adjudicator must be specifically explained. See Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992).

Separate disabilities arising from a single disease entity are to be rated separately. 38 C.F.R. § 4.25 (2015); see also Esteban v. Brown, 6 Vet. App. 259, 261 (1994). Pyramiding-the evaluation of the same disability or the same manifestations of a disability under different diagnostic codes-is to be avoided when rating a veteran's service-connected disabilities. 38 C.F.R. § 4.14 (2015).

Under the General Rating Formula for Mental Disorders, in pertinent part, a 30 
percent rating is assigned when a veteran's PTSD causes occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, or mild memory loss (such as forgetting names, directions, recent events). 38 C.F.R. § 4.130, Diagnostic Code 9411.

A 50 percent rating is assigned when a veteran's PTSD causes occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short-term and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; or difficulty in establishing and maintaining effective work and social relationships. Id.

A 70 percent evaluation is assigned when a veteran's PTSD causes occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work like setting); or an inability to establish and maintain effective relationships. Id.

A 100 percent rating is assigned when a veteran's PTSD causes total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; danger of hurting self or others; intermittent inability to perform activities of living (including maintenance of minimal hygiene); disorientation to time or place; or, memory loss for names of close relatives, occupation, or own name. Id. 

When rating a mental disorder, VA must consider the frequency, severity, and duration of the Veteran's psychiatric symptoms, the length of remissions, and the Veteran's capacity for adjustment during periods of remission. The rating agency must assign a rating based on all the evidence of record that bears on occupational and social impairment, rather than solely on the examiner's assessment of the level of disability at the moment of the examination. When rating the level of disability from a mental disorder, the rating agency must consider the extent of social impairment, but cannot assign a rating solely on the basis of social impairment. 38 C.F.R. § 4.126 (2015). 

Furthermore, the specified factors for each incremental rating are examples, rather than requirements, for a particular rating. The Board will not limit its analysis solely to whether the Veteran exhibited the symptoms listed in the rating criteria. Mauerhan v. Principi, 16 Vet. App. 436 (2002). Indeed, the symptoms listed under § 4.130 are not intended to serve as an exhaustive list of the symptoms that VA may consider but as examples of the type of degree of symptoms, or the effects, that would warrant a particular rating. Mauerhan, 16 Vet. App. at 442 (2002). The Veteran's actual symptomatology, and resulting social and occupational impairment, will be the primary focus when assigning a disability rating for a mental disorder, and the Veteran may qualify for a particular rating by demonstrating the particular symptoms associated with that percentage, or other symptoms of similar severity, frequency, and duration. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 116-17 (Fed. Cir. 2013).

That portion of VA's Schedule for Rating Disabilities ("the Schedule") that addresses service-connected psychiatric disabilities was based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM) IV prior to a change effective August 4, 2014. 38 C.F.R. § 4.130 (2015). The regulation has been changed to reflect the current DSM-DSM V. DSM-IV contained a Global Assessment of Functioning (GAF) scale, with scores ranging between zero and 100 percent, representing the psychological, social, and occupational functioning of an individual on a hypothetical continuum of mental health-illness. Higher scores correspond to better functioning of the individual. This case involves assignment of GAF scores and those assignments are relevant to the Veteran's level of impairment due to his PTSD.

GAF scores ranging from 41 to 50 reflect serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, inability to keep a job). GAF scores ranging from 51 to 60 indicate moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). GAF scores ranging from 61 to 70 indicate mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. GAF scores ranging from 71 to 80 denote transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g. temporarily falling behind in schoolwork). 

Turning to the facts in this case, as an initial matter, in addition to having PTSD, the Veteran has experienced several strokes both before and during his appeal, and he has been diagnosed with an associated mild neurocognitive disorder. With that said, clinicians have not drawn a clear distinction between the symptomatology associated with the Veteran's PTSD and that associated with his neurocognitive disorder. Indeed, as the May 2014 examiner stated, the Veteran's diagnoses of PTSD and mild neurocognitive disorder have been continuous and are "biologically and behaviorally interactive". The Board will therefore assume that all of the Veteran's psychological symptoms are attributable to his service-connected PTSD. See Mittleider v. West, 11 Vet. App. 181, 182 (1998) (per curiam).

The Veteran filed his claim for service connection in April 2002. In an April 2002 clinical record, it was noted that the Veteran had recently separated from his spouse following 30 years of marriage, and that he had experienced suicidal thoughts. The Veteran was incarcerated for two weeks in June 2002 after battering his adult son. The Veteran felt depression, shame, and anxiety about the future without his family. In a June 2002 record, the Veteran's spouse indicated that the Veteran had numerous extramarital affairs and had been physically abusive towards both her and their children. The Veteran was under a restraining order not to return to his home. The Veteran's spouse indicated that the Veteran was "very impulsive" with "unpredictable mood swings". 

In August 2002, the Veteran was admitted to a psychiatric hospital after expressing suicidal ideation. In September 2002, the Veteran complained of memory problems since experiencing a stroke. The clinician observed that the Veteran appeared to be depressed, and his children were with his former spouse. In a separate record from September 2002, the Veteran indicated that he was "not so good," and he was facing jail time after threatening his spouse and violating a restraining order. In a separate record from September 2002, a clinician assigned the Veteran a GAF score of 49.

In January 2003, it was noted that the Veteran resided with his wife of 30 years. The Veteran had four children. The Veteran drove and took care of his personal affairs. Also in January 2003, the Veteran was found guilty of violating a protective order associated with domestic violence. In July 2003, the Veteran reported that both his mood and life generally were improving. The Veteran had recently reconciled with his spouse, and he attended an anger management program. The Veteran denied experiencing depression. In August 2003, the Veteran was completing a court-mandated anger management course. 

In January 2006, the Veteran had no psychiatric complaints and indicated that he was "doing well." The Veteran indicated that he had previously worked in the insurance industry, but he retired eight years ago as the result of a back injury. The Veteran was divorcing his spouse of 33 years. The Veteran had four children, but he only spoke with his oldest child, and he lived alone. In March 2006 and September 2006, clinicians assigned the Veteran a GAF score of 65. In December 2006, the Veteran had recently moved to New Hampshire to be close to his girlfriend and children, and a clinician assigned the Veteran a GAF score of 50. 

In January 2007, the Veteran felt significantly depressed at times, and he had passive suicidal ideation without any specific intentions. The Veteran had divorced recently, and he indicated that he was close to his adult children. The clinician assigned the Veteran a GAF score of 55. In April 2007, the Veteran reported experiencing recent difficulties with a "bad breakup" of a romantic relationship. The Veteran was noted to be emotionally labile as a baseline. The Veteran had recently restored a long-estranged relationship with his daughter. The Veteran continued to have confusion and feelings of being overwhelmed, angry, and anxious. The clinician assigned the Veteran a GAF score between 55 and 59. In September 2007, the Veteran indicated that he had experienced a significant improvement in his concentration and focus over the past several weeks. The Veteran had given some presentations in church that had been well received. The clinician assigned the Veteran with a GAF score of 65.

In November 2007, the Veteran felt that he would never "get through [his] depression." The Veteran had limited support and felt unable to develop relationships. In a separate record from November 2007, it was noted that the Veteran had been charged with assault and battery four years before following an altercation with his spouse. The Veteran indicated that following his divorce, he was involved in a relationship for a year and a half. The Veteran reported that he had an "on and off" relationship with his children. The Veteran indicated that he had previously been involved with his church, but this involvement had dwindled. The clinician assigned the Veteran with a GAF score of 55.

In January 2008, the Veteran returned from a "great" trip to Europe with his daughter. The Veteran indicated that he had not felt any depression for some time. The Veteran was struggling with "a couple relationship issues" but he was feeling well otherwise. The Veteran was stable in terms of mood and behavior, and a clinician assigned the Veteran a GAF score between 60 and 65. In May 2009, the Veteran described experiencing an increase in his mood reactivity and emotionality over the preceding several months. The clinician assigned the Veteran a GAF score of 50. 

The Veteran underwent a VA examination in July 2009, at which time the examiner noted that the Veteran was divorced, lived alone, and was not involved in a romantic relationship. The Veteran indicated that his relationships with his children were changeable. The Veteran indicated that he had not worked for 10 years; the Veteran stopped working after being attacked by dogs. 

The examiner noted that the Veteran was initially tense, rigid, and verbally combative, but he ultimately cooperated in the examination. The Veteran's speech was normal and relaxed, and his mood and affect were appropriate. The Veteran had no hallucinations, illusions, or delusions. The Veteran's thought process tended to be circumstantial, but he was easily redirected. The Veteran had no obsessions, but he was preoccupied with his pending claim for service connection. The Veteran had no suicidal or homicidal ideation, and he was fully oriented. The examiner noted that the Veteran had moderate problems with attention and concentration resulting in short term memory problems, but the Veteran's long term memory appeared to be intact. The Veteran's ability for abstract and insightful thinking was within the normal range. The Veteran's common sense reasoning, judgment, and moral and ethical thinking were normal.

The Veteran slept about five hours nightly, and his energy level depended on how much sleep he had. The Veteran indicated that he felt "forlorn", but he denied having anxiety. The examiner assigned the Veteran with a GAF score of 75 because the Veteran appeared to be functioning relatively well with some meaningful interpersonal relationships. The Veteran did his own cooking, cleaning, and grocery shopping. The Veteran had projects (including a project for the Knights of Columbus), and he had written a magazine article. The examiner noted that the Veteran's psychiatric symptoms were transient and mild, and they decreased the Veteran's work efficiency and his ability to perform occupational tasks only during periods of significant stress. The examiner found that the Veteran's symptoms would only mildly interfere with his employment and social functioning. 

In March 2010, the Veteran described feeling distance from his children, experiencing the dissolution of his marriage, and having difficulty holding jobs. The Veteran socially isolated and distanced himself from his family, colleagues, and friends. The Veteran tried to push himself into church activities because such activities provided him with support. The Veteran indicated that he was quick to anger. The Veteran was noted to have "overall stability" in terms of his mood. In June 2010, the Veteran indicated that he had been experiencing significant difficulty with sleep and mood. The Veteran was planning to move to Florida temporarily in order to care for his adult son. The Veteran had no suicidal or homicidal ideation. The clinician assigned the Veteran a GAF score of 58. 

In a January 2011 hearing before RO personnel, the Veteran indicated that he had an inability to maintain close relationships with people, problems with memory, and problems with anger. The Veteran indicated that he had no social life, and difficulty getting along with his family. The Veteran stated that he had been estranged from his two oldest children for years. In February 2011, the Veteran stated that he lost his marriage due to his uncontrollable pain and fears. The Veteran stated that he had no friends, no life, and no love for people. The Veteran stated that he was always angry, and he indicated that he had been found guilty of physically striking his daughter. In March 2011, while the Veteran's affect was "down" when describing the impact of sleep problems on his mood, the Veteran was additionally able to share humor and his enjoyment from continued involvement with church and the Knights of Columbus. The Veteran denied experiencing suicidal or homicidal ideation. In April 2011, the Veteran reported that he continued to experience problems with sleep, which was disruptive to the Veteran's mood and cognitive processes. 

In July 2011, a clinician assigned the Veteran a GAF score of 58. The clinician noted that the Veteran had supportive family and friends, and he had good adherence to treatment and medication. The clinician noted additionally that the Veteran had cognitive difficulties and mood lability and impulsivity. In a separate July 2011 record, the Veteran reported that he had recently been more irritable. The Veteran reported that he tried to go to church every day, which improved his mood. 

In his August 2011 hearing before the undersigned, the Veteran reported that he experienced sleeplessness and anger as a result of his PTSD. The Veteran indicated that he had been arrested several times as a result of anger issues associated with PTSD. The Veteran indicated that he had no personal relationships. In August 2011, the Veteran's former spouse stated that the Veteran was "very moody" and "overly sensitive". These problems progressed into an inability to function well at his job. The Veteran's former spouse indicated that she had divorced the Veteran 5 years earlier after 33 years of marriage. 

In March 2012, the Veteran had a normal mood and affect and was oriented to person, place, and time. In a separate record from March 2012, a clinician noted that the Veteran was retired and divorced. The Veteran denied experiencing depression, tearfulness, or anxiety. The Veteran was found to have a mood disorder and memory problems secondary to a cognitive disorder. 

The Veteran underwent an additional VA examination in May 2014, at which time the Veteran reported that PTSD had ruined both his and his family's lives. The Veteran reported experiencing intrusive thoughts and avoidance of conversational topics. The Veteran had diminished interest in activities that he previously enjoyed and emotional detachment. The Veteran had irritability, difficulty with concentration, and poor sleep. The examiner found that the Veteran had occupational and social impairment with reduced reliability and productivity. The clinician noted that the Veteran had mild impairment of his short term memory.

The examiner noted that the Veteran had "parted company" with his son since the time of his 2009 examination because "he needed [the Veteran's] money." The Veteran had six other children, and the Veteran had close relationships with two of his sons. The Veteran noted that he had recently reconciled with a daughter, and they were beginning to build a relationship. The Veteran resided in an assisted living facility following a February 2014 fall that injured his head and spine. The Veteran reported that he had one friend, and while he was generally friendly with people, he preferred not to develop close relationships. The Veteran reported that he rode around town in his wheelchair, attended church daily, and stayed with his girlfriend on the weekends. 

The examiner found that the Veteran engaged in avoidance to avoid external reminders of his stressors, and he had a persistently negative emotional state. The Veteran had markedly diminished interest or participation in significant activities and feelings of detachment or estrangement from others. The Veteran had irritable behavior and angry outbursts typically expressed as verbal or physical aggression toward people or objects, problems with concentration, and sleep disturbance. These symptoms caused clinically significant distress or impairment in social, occupational, or other areas of functioning. 

The Veteran had chronic sleep impairment, mild memory loss, impaired memory, a flattened affect, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, including work or a
work-like setting, neglect of personal appearance and hygiene, and an intermittent inability to perform activities of daily living, including maintenance of minimal personal hygiene. The Veteran was found to be capable of managing his financial affairs. 

Turning now to an analysis of the evidence of record, the Board will address whether the Veteran is entitled to a disability rating in excess of 30 percent for PTSD before May 13, 2014, or a disability rating in excess of 70 percent thereafter. 

With regard to a 100 percent disability rating, the Board finds that the Veteran has not shown the total occupational and social impairment that is associated with a 100 percent disability rating for any distinct time during the course of his appeal. 

With regard to the Veteran's occupational impairment, the Veteran was retired throughout the period on appeal, and he lived independently before his February 2014 fall. While the Veteran complained of difficulty with memory and cognition throughout the appeal, the Board notes that the Veteran independently managed his financial affairs even after entering an assisted living facility. The Veteran was consistently alert and cogent when seeking treatment from clinicians. With the Veteran consistently alert, aware, and able to manage his own finances, the Board cannot find that the Veteran has shown total occupational impairment at any time during the appeal. 

With regard to the Veteran's social impairment, while the evidence indicates that the Veteran's 33-year marriage came to a tumultuous end in 2006, the Veteran has otherwise periodically maintained relationships with his children and romantic partners following the end of his marriage. While the Veteran indicated that he preferred not to develop close relationships, he stated, for example in May 2014, that he was "generally friendly" with others. With the Veteran maintaining relationships with others throughout the appeal, the Board cannot find that the Veteran has shown total social impairment at any time during the appeal. 

Furthermore, no clinician has found the Veteran to be totally occupationally or socially impaired to the degree contemplated by a 100 percent rating. Thus, the Board finds that the evidence of record does not support a finding that the Veteran has suffered from the total occupational and social impairment that is associated with a 100 percent disability rating. 

The Veteran's 70 percent rating for PTSD is thus the maximum rating available to the rating after May 13, 2014, and the Board's analysis will turn to the question of whether a rating in excess of 30 percent is available to the Veteran before that time. Upon close review of the record, the Board finds that the Veteran's symptoms warrant a single 70 percent disability rating throughout the period on appeal. In other words, the Board does not find that the Veteran's symptomatology clearly worsened as of May 13, 2014. Instead, throughout the Veteran's appeal, his symptoms have remained consistent, causing him to experience occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood. 

In support of this finding, the Board first notes that many clinicians, for example in April 2007 and July 2011, found the Veteran to be emotionally labile. Consistent with this finding, the Veteran's treatment records show significant swings in functioning over short periods of time. For example, in September 2007, the Veteran had a "significant improvement" in his mood, but by November 2007, the Veteran despaired that he would never "get through [his] depression." The evidence also shows significant variations in GAF scores in short periods of time; for example, the Veteran's GAF increased by 25 points in less than two months from May 2009 to July 2009. Given the Veteran's emotional lability, the Board has examined the broad symptom picture presented during the appeal, rather than rely on the notations in individual treatment records.

The evidence shows that the Veteran has struggled to initiate and maintain effective relationships throughout the appeal. During the appeal, the Veteran, for example, separated from his spouse of 33 years, was allegedly physically abusive to his spouse and children, violated protective orders, and ultimately divorced his spouse. The Veteran later experienced a "bad breakup" and had variable relationships with his children. The symptom picture is consistent with a finding that the Veteran experienced occupational and social impairment, with deficiencies in most areas.

In making this determination, the Veteran's GAF scores, ranging from 49 to 75, have been considered. The Board finds that these scores, which are largely reflective of moderate to serious symptoms, and particularly when considered along with the symptoms contained in the associated clinical reports, are consistent with the assignment of a single 70 percent rating throughout the period on appeal. 

In sum, the Board finds that the preponderance of the evidence favors the assignment of a single rating of 70 percent throughout the period on appeal. 38 U.S.C.A. § 5107(b) (West 2014); Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

III. Fenderson Considerations

The Board finds that other than the initial 70 percent disability rating assigned to the service-connected PTSD for the entire appeal period, there are no other bases for staged ratings pursuant to Fenderson, supra; see also 38 C.F.R. § 3.400 (2015).

IV. Extraschedular Considerations

The Board also finds that the schedular rating criteria adequately describe the Veteran's symptoms and disability and, thus, contemplate the Veteran's PTSD, as discussed in the evidence set forth above. This means that the Veteran's PTSD does not manifest with an exceptional disability picture. See Thun v. Peake, 22 Vet. App. 111 (2008). In the absence of an exceptional disability picture, there is no factual basis for referral for a higher rating on an extraschedular basis. 38 C.F.R. § 3.321 (b)(1) (2015). In this regard, the Board is aware of the decision of Johnson v. McDonald, 762 F.3d 1362, 1365-66 (Fed. Cir. 2014), wherein the Court of Appeals for the Federal Circuit (Federal Circuit) held that the Board must consider the cumulative impact of all service-connected disabilities under consideration when assessing whether extraschedular consideration is considered. There is no indication that the Federal Circuit extended its holding in Johnson to disabilities not before the Board when considering an appeal. Here, the Veteran's sole service-connected disability is PTSD. Accordingly, no further action pursuant to Johnson v. McDonald is necessary.

V. Total disability evaluation based on individual Unemployability (TDIU)

As a final matter, the Board finds that a claim of entitlement to a total disability evaluation based on individual unemployability due to PTSD has not been raised by the record, and no further action pursuant to Rice v. Shinseki, 22 Vet. App. 447 (2009) is necessary. In this regard, during an August 2011 hearing before the undersigned, the Veteran testified that he was unemployed as a result of a physical disability, not his PTSD. (See August 2011 Transcript (T.) at page (pg.) 9)). Thus, the Board finds that a claim for a TDIU has not been raised in the instant appeal. Id.
ORDER

Before May 13, 2014, an initial rating of 70 percent for PTSD is granted, subject to the rules and regulations governing the award of monetary benefits.

From May 13, 2014, an initial rating in excess of 70 percent for PTSD is denied. 

REMAND

With respect to the Veteran's claims of entitlement to an effective date before June 11, 2014, for the awards of a non-service-connected pension and SMP based on the need for aid and attendance, certain procedural steps must be followed to grant the Board jurisdiction to review these claims. First, once a rating decision is issued, the veteran or his representative must file a timely notice of disagreement; so long as the issues being appealed are clear. The AOJ, by law, must then issue a statement of the case; finally, to convey jurisdiction to hear the case on the Board, the veteran must file a timely substantive appeal. 38 C.F.R. §§ 19.26, 20.200, 20.201, 20.302(a) (2015). 

Here, by a July 2014 rating action, the RO granted the Veteran's claims of entitlement to a non-service-connected pension and SMP based on the need for aid and attendance with an effective date of June 11, 2014. In August 2014, the Veteran submitted a notice of disagreement as to the RO's assignment of an effective date of June 11, 2014 for the above-cited awards. The AOJ has not issued a statement of the case addressing the issues of entitlement to an effective date prior to June 11, 2014 for the awards of a non-service-connected pension and SMP based on the need for aid and attendance, and it is therefore proper to remand these issues to ensure that the Veteran is provided with a statement of the case. Manlincon v. West, 12 Vet. App. 238, 240-41 (1999). However, these issues should be returned to the Board after issuance of the statement of the case only if perfected by the filing of a timely substantive appeal. See Smallwood v. Brown, 10 Vet. App. 93, 97 (1997).

Accordingly, the case is REMANDED for the following actions:

Consider the issues of entitlement to an effective date prior to June 11, 2014, for the awards of a non-service-connected pension and SMP based on the need for aid and attendance. If any benefit sought cannot be granted, a statement of the case should be issued in accordance with applicable law and regulations. The Veteran should be informed of the period of time within which he must file a substantive appeal to perfect his appeal to the Board concerning this issue. If a timely substantive appeal is not filed, the claim should not be certified to the Board. 

The Veteran has the right to submit additional evidence and argument on the matters that the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

These claims must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

____________________________________________
C. KAMMEL
Acting Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs